United States District Court
Southern District of Texas

**ENTERED**

July 28, 2017

David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| EPHREM EYOB, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-16-1688 |
| | § | |
| MITSUBISHI CATERPILLAR | § | |
| FORKLIFT AMERICA INC., | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION & ORDER

Pending before the court are (1) defendant Mitsubishi Caterpillar Forklift America Inc.'s ("MCFA") motion for summary judgment (Dkt. 21), and (2) plaintiff Ephrem Eyob's motion for partial summary judgment (Dkt. 22). Having considered the motions, responses, reply, evidentiary record, and the applicable law, the court is of the opinion that (1) MCFA's motion for summary judgment (Dkt. 21) should be GRANTED, and (2) Eyob's motion for partial summary judgment (Dkt. 22) should be DENIED AS MOOT.

## I. BACKGROUND

This is a case about alleged employment discrimination and an alleged hostile work environment. Dkt. 1. Eyob is an African American male, originally from Ethiopia. Dkt. 1 at 2. Eyob was terminated from his position as a Plant Supervisor at MCFA after working there for fourteen years. *Id*. MCFA is a manufacturer and distributor of forklifts. Dkt. 22. Eyob's causes of action against MCFA are racial discrimination and a hostile work environment under 42 U.S.C. § 2000e ("Title VII") and 42 U.S.C. § 1981. Dkt. 1 at 5.

**A.** **Eyob's Employment with MCFA**

On June 5, 2000, Eyob began working for MCFA as a 2nd Shift Assembler.  Dkt. 21, Ex. A (Pierce Dec.).  In 2009, Eyob was promoted to Crew Leader, reporting to the Plant Supervisor, Jimmy Uy.  Dkt. 21, Ex. B (Eyob Dep.) at 3.  During that time, Uy reported to Marvin Chasteen, the Senior Manufacturer of Marking.  *Id*.  Dkt. 21, Ex. A at 3.

On January 2, 2012, MCFA promoted Eyob to Plant Supervisor in the manufacturing division, reporting to Saravan Sigamani.  Dkt. 21, Ex A-1.  Sigamani, in turn, reported to Chasteen.  Dkt. 21, Ex. B (Eyob Dep.) at 8.  As a Plant Supervisor, Eyob initially managed 16 employees on Manufacturing Main Line 2.  *Id*. at 6.  A few months later, Eyob was transferred to Manufacturing Main Line 1 ("Line 1"), managing 53 to 57 employees.  *Id*.  In 2012, Sigamani administered Eyob's performance appraisal, and Eyob recieved an overall score of "achieved expectations," with a mix of "exceeded expectations," "achieved expectations," and "generally met expectations" scores in the various categories of the appraisal.  Dkt. 23, Exs. F, G.

On May 6, 2013, Eyob started reporting directly to Chasteen.  Dkt. 21, Ex. A-2.  The other Plant Supervisors who reported to Chasteen were Carlos Perez (Mast Assembly), Uy (Final Finish), and Chip Hilgert (Main Line 2).  Dkt. 21, Ex. B (Eyob Dep.) at 10.

Chasteen claims that he repeatedly addressed quality and excessive overtime issues with Eyob with respect to Line 1.  Dkt. 21, Ex. C (Chasteen Dep.) at 6.  The quality issues were documented in Eyob's performance evaluation both mid-year and end-of-year 2013, where he received a "generally met expectations" overall score, and his appraisal reflected declining performance compared to 2012.  Dkt. 23, Exs. B, I.  Late in 2013, Eyob's line encountered a quality issue with the assembly of a hydraulic lever.  Dkt. 21, Ex. C (Chasteen Dep.) at 14–15.  The issue was addressed with the engineering department.  *Id.* at 18–19

2

In April 2014, the hydraulic lever issue reoccurred on Line 1.  *Id*.   On April 10, 2014, Chasteen claims that he discussed the issue with his supervisor, Jay Gusler, and they made the decision to terminate Eyob.  *Id*. at 14.  Eyob was terminated that day.  *Id*.   Eyob was replaced with Guillermo Amezaga, who is Hispanic, as Plant Supervisor for Line 1.  Dkt. 21, Ex. A (Pierce Dec.) at 3.

MCFA's employee handbook contains a progressive discipline policy that explains that MCFA can issue a series of verbal or written warnings for poor performance.  Dkt. 23, Exs. D ("first policy"), E ("second policy").[1]   However, the policies also state that MCFA can terminate an employee without warning.  Dkt. 23, Exs. D, E.  MCFA admits that it terminated Eyob without issuing him any warnings under the progressive discipline policy.  Dkt. 21 at 29.

**B.     Eyob's Allegations of Harrassment and Discrimination**

Eyob alleges that he was subjected to a number of instances of harassment, beginning in 2009.  Dkt. 23-13 (Eyob Dep.) at 5.   Though Eyob was not directly supervised by Chasteen, he claims that throughout this time period, Chasteen found opportunities to chastise him for taking time off work and to raise concerns about his assembly line.  Dkt. 21, Ex. B (Eyob Dep.) at 3–4, 9.  When Chasteen became Eyob's supervisor, Eyob alleges that Chasteen made comments such as "you work for me now," that he "just got lucky" with his promotion, and that he should "be careful" about raising an issue during a morning meeting.  Dkt. 21, Ex. B (Eyob Dep.) at 17, 28.  In May 2013, Eyob claims that Chasteen falsely accused the employees of Line 1 of deliberately damaging trucks to create overtime.  Dkt. 21, Ex. B (Eyob Dep.) at 28–29.  Additionally, Eyob argues that Chasteen prevented him from leading a tour of the MCFA facility during the 2014 Houston Livestock Show

---

[1] MFCA also submitted copies of the two policies.  Dkt. 21, Exs. A-6 ("first policy"), A-7 ("second policy").

and Rodeo. *Id.* at 26–27, 32 (claiming that Eyob believed that Chasteen did not want an African American representing the company to dealers); Dkt. 23-3 (Eyob. Dep) at 15. Further, Eyob alleges that at least once he was told to "deal with it," when he was shorthanded for the day and asked for extra staff. Dkt. 21, Ex. B (Eyob Dep.) at 12.

Further, Eyob alleges that Chasteen told him, during the lead up to the 2012 Presidential election, that he should not vote for Barack Obama because the candidate was in favor of giving "free health care and food stamp[s] for black people." *Id.* at 23. Chasteen disputes that this conversation occurred and agrees that if it had, it would be inappropriate. Dkt. 21, Ex. C (Chasteen Dep.) at 21–22. Sometime after April 2013, Eyob entered Chasteen's office and witnessed Chasteen and Uy watching an offensive video of a native, rural African village that depicted the villagers as stupid. Dkt. 21, Ex. B (Eyob Dep.) at 22–23; Dkt. 21, Ex. C (Chasteen Dep.) at 25–26 (disputing that Eyob witnessed him watching the video and agreeing that the video was inappropriate). Eyob also alleges that Chasteen would waive his finger at Eyob to get Eyob to come to him. Dkt. 21, Ex. B (Eyob Dep.) at 25–26. Eyob claims that he explained to Chasteen that this type of gesture was rude in the Ethiopian culture and asked him to stop, but that Chasteen continued to make the gesture at least 20 or 30 more times. *Id*. Chasteen claims that he did not know that finger-waving was considered rude in Ethiopian culture. Dkt. 21, Ex. C (Chasteen Dep.) at 23.

Additionally, Eyob alleges that he witnessed Chasteen referring to black employees other than Eyob as "Mr. Wayne" at least four or five times, apparently in reference to a former African American employee of MCFA named Wayne Billard. Dkt. 21, Ex. B (Eyob Dep.) at 25–26. *But see* Dkt. 21, Ex. C (Chasteen Dep.) at 23 (denying this accusation). Finally, Chasteen replied in his deposition testimony "[g]osh I don't know" and "[i]t's possible" that he may have used the n-word at some time in the last five years. Dkt. 23-13 (Chasteen Dep.) at 56. However, Eyob does not

4

testify that he witnessed Chasteen using this derogatory racial slur.  Dkt. 21, Ex. B (Eyob Dep.);

Dkt. 23-13 at 2–20 (Eyob Dep.).

### C.  Procedural History

Eyob initially filed his discrimination complaint under Title VII with the U.S. Equal

Employment Opportunity Commission ("EEOC").  Dkt. 1, Ex. A.  On May 11, 2016, the EEOC

dismissed the case and notified Eyob of his right to sue.  *Id.*  On June 13, 2016, Eyob filed his

complaint against MCFA.  Dkt. 1.  On December 29, 2016, MCFA answered and asserted

affirmative defenses.  Dkt. 6.  On March 13, 2017, MCFA filed its motion for summary judgment.

Dkt. 21.  Eyob responded, and MCFA replied.  Dkts. 23, 24.  On March 13, 2017, Eyob filed a

motion for partial summary judgment on MCFA's mixed motive defense and failure to mitigate

damages defense.  Dkt. 22.  MCFA responded, but Eyob did not reply.  Dkt. 25.

## II. LEGAL STANDARD

A court shall grant summary judgment when a "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c).  "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for

the non-moving party."  *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).  The

moving party bears the initial burden of demonstrating the absence of a genuine issue of material

fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  If the party meets its

burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue

for trial.  Fed. R. Civ. P. 56(e).  The court must view the evidence in the light most favorable to the

non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org.*

*v. City of Dall., Tex.*, 529 F.3d 519, 524 (5th Cir. 2008).

### III. ANALYSIS

First, the court will consider MCFA's motion for summary judgment on Eyob's claims of employment discrimination and a hostile work environment. Dkt. 21. Then, the court will consider Eyob's motion for partial summary judgment on MCFA's affirmative defenses. Dkt. 23.

**A.    Employment Discrimination Based on Race**

Eyob alleges that he was terminated from his position with MCFA on the basis of his race in violation of Title VII and 42 U.S.C. § 1981. Dkt. 1 at 5. Title VII makes it unlawful for an employer to discharge an employee because of his or her "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Section 1981 states "[a]ll persons . . . shall have the same right[s] . . . as enjoyed by white citizens." 42 U.S.C. § 1981(a). "Employment discrimination claims brought under 42 U.S.C. § 1981 . . . are analyzed under the evidentiary framework applicable to claims arising under Title VII." *Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309, 311 (5th Cir. 1999).

A plaintiff can prove intentional discrimination through either direct or circumstantial evidence. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345 (5th Cir. 2007). Direct evidence is evidence which, if believed, proves the fact without inference or presumption. *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) (citing *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir.1993)). When race discrimination claims are based on circumstantial evidence, courts apply the *McDonnell Douglas* burden-shifting framework. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Here, the parties agree that the burden-shifting framework is applicable

6

because Eyob presents circumstantial evidence in support of his discrimination claim.  Dkt. 21 at 18; Dkt. 23 at 19–20.[2]

First, under the burden-shifting framework, a plaintiff must present a *prima facie* case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  To establish a *prima facie* discrimination case under Title VII, the plaintiff must show that he (1) is a protected class member, (2) was qualified for his position, (3) suffered an adverse employment action, and (4) that others similarly situated were treated more favorably.  *Okoye v. Univ. of Tex. Hou. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001) (citing *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999)).

If the plaintiff is successful in presenting a *prima facie* case of discrimination, the burden of production shifts to the employer to "rebut a presumption of discrimination by articulating a legitimate, nondiscriminatory reason for the adverse employment action."  *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345 (5th Cir. 2007) (citing *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 402 (5th Cir.2001)).  Then, "[if] the employer meets its burden, then [the burden] shifts back to the plaintiff to present substantial evidence that the employer's reason was pretext for discrimination."  *Id.*   "If the plaintiff can show that the proffered explanation is merely pretextual, that showing, when coupled with the *prima facie* case, will usually be sufficient to survive summary judgment."  *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146–48, 120 S.Ct. 2097 (2000)).

The appropriateness of summary judgment depends on "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other

---

[2] Eyob also argues that there is "direct" evidence in the present case, but his response brief only points to circumstantial evidence implicating the burden-shifting framework.  Dkt. 23 at 19–20.

evidence that supports the employer's case and that properly may be considered." *Price v. Fed. Exp. Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (quoting *Reeves*, 530 U.S. at 148–49).

MCFA concedes that Eyob's claim establishes a *prima facie* case of discrimination.  Dkt. 21 at 24.  However, MCFA argues for summary judgment in its favor under the burden-shifting framework because: (1) it has produced a legitimate non-discriminatory reason for Eyob's termination, and (2) Eyob has failed to meet his burden to demonstrate the existence of a genuine issue of material fact that MCFA's reason for his termination was a pretext for racial discrimination. Dkt. 21 at 24–29.

### 1. Legitimate, Non-Discriminatory Reason for Termination

MCFA argues that it terminated Eyob for a legitimate, non-discriminatory reason.  *Id*. at 24. "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097 (2000).  "Poor work performance is a legitimate, non-discriminatory reason for discharge." *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 326 (5th Cir. 2002).

Here, MCFA claims that Eyob was terminated for poor work performance—specifically citing repeated quality issues on Line 1, which Eyob managed.  Dkt. 21 at 25.  Chasteen testified that he addressed quality issues with Eyob during his performance reviews and verbally throughout 2013. Dkt. 21, Ex. C (Chasteen Dep.) at 14–15.  Chasteen claims that he made his final decision to terminate Eyob after the April 2014 quality issues reoccurred on the hydraulic levers on the forklifts from Eyob's line.  Dkt. 21, Ex. C (Chasteen Dep.) at 14–15.  Eyob does not dispute that there were quality issues with the production lines, nor does he dispute that Chasteen addressed quality issues during the year leading up to his termination.  Dkt. 21, Ex. B (Eyob Dep.) at 11, 13–15.

8

Despite this evidence, Eyob argues MCFA's reasons for his termination is "false, weak, or noncredible." Dkt. 23 at 24 (citing *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 237 (5th Cir. 2016)).  Eyob claims that MCFA's reasons for his termination were so completely non-credible that they are evidence of pretext.  Dkt. 23 at 24 (citing *Reeves*, 530 U.S. at 133).  In support of his argument, Eyob challenges Chasteen's assessment that his line was responsible for the quality issues with the hydraulic lever.  Dkt. 23 at 10 (citing Dkt. 23, Ex. L and Dkt. 23-13 (Chasteen Depo.) at 43).  However, this challenge is a conclusory allegation only, Eyob does not support it with any evidence except for Chasteen's statement that "[there] was really no way to go back and investigate it."  Dkt. 23-13 at 43.  MCFA produced evidence that the quality issues with the hydraulic levers originated from Eyob's line—not Uy's Final Finish Line as Eyob contends. Dkt. 24, Ex. B (Krakora Dep.) at 5.  The court finds that Eyob has not established a dispute of material fact about the source of the hydraulic lever quality issue.

In the alternative, Eyob argues that the issue with the hydraulic lever was not a severe safety issue, as Chasteen contends.  Dkt. 23 at 24.  However, "even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason.  The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *lsoLittle v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). It is not a part of the court's inquiry to evaluate MCFA's business decisions regarding the source and severity of the quality issues with the hydraulic levers.  *Walton v. Bisco Indus., Inc.*, 119 F.3d 368, 372 (5th Cir. 1997), *overruled on other grounds by Reeves*, 530 U.S. at 133 (holding that "we do not view the discrimination laws as vehicles for judicial second-guessing of business decisions."). Further, "[s]imply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext." *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir.2007).

9

Therefore, the court finds that MCFA has met its burden of production to establish that it had a legitimate, non-discriminatory reason to terminate Eyob and Eyob's arguments disputing MCFA's decision do not create an issue of pretext.

### 2. Pretext For Discrimination

Because the court has found that MCFA has successfully produced a legitimate, non-discriminatory reason for Chasteen's  decision to terminate Eyob, the burden shifts back to Eyob to establish an issue of material fact that MCFA's reason is a pretext for discrimination. *Turner*, 476 F.3d at 345.  Eyob must produce "substantial evidence" of pretext to show that MCFA's "proffered reason [for his termination] is unworthy of credence." *Auguster*, 249 F.3d at 403 (quoting *Bauer v. Albemarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999)).  An employee's subjective belief of discrimination alone is not sufficient to warrant judicial relief. *Grimes v. Tex. Dep't of Mental Health and Mental Retardation*, 102 F.3d 137, 139 (5th Cir. 1996) (conclusory allegations, unsubstantiated assertions, and subjective beliefs are insufficient to support discrimination claim).

Eyob argues that he has established pretext because (1) MCFA's failed to follow its "progressive discipline" policy, (2) other similarly-situated plant supervisors were treated more favorably, and (3) Chasteen exhibited racial animus. Dkt. 23 at 22; 24–27.  MCFA argues that the "same actor" inference creates a presumption against pretext in this case.  Dkt. 21 at 20.  The court will address each of these arguments in turn.

### a. Same Actor Inference

MCFA argues that it is entitled to the "same actor" inference against pretext, because the same manager both promoted and terminated Eyob.  Dkt. 21 at 20.  "The same actor inference creates a presumption that animus was not present where the same actor responsible for the adverse employment action either hired or promoted the employee at issue." *Spears v. Patterson UTI*

10

*Drilling Co.*, 337 F. App'x 416, 421–22 (5th Cir. 2009).  Here, MCFA argues the same actor inference principle is applicable because Chasteen approved Eyob's promotion to Plant Supervisor and Chasteen also terminated Eyob.  Dkt. 21 at 20.  However, MCFA admits that Sigamani actually made the decision to promote Eyob, and that "Chasteen questioned the decision but ultimately approved it."  Dkt. 21 at 8; Dkt. 23 at 6.  The court finds that there is a question of material fact about whether Sigamani and/or Chasteen was responsible for promoting Eyob, with respect to the same actor inference.  Therefore the court will not apply the same actor inference in this case.

### b. Progressive Discipline

Eyob argues that MCFA's failure to follow its progressive disciplinary policy is evidence of pretext.  Dkt. 23 at 25–26 (citing *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 354 (5th Cir. 2005)).  "[W]hen an employer opts to have a disciplinary system that involves warnings, failure to follow that system may give rise to inferences of pretext."  *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 477 (5th Cir. 2015).  In *Machinchick*, the Fifth Circuit considered the defendant employer's failure to issue a warning to the plaintiff employee using the company's progressive discipline policy, combined with evidence of the plaintiff's success closing on a sale, compliments from a supervisor, and absence of contrary performance evaluations.  *Machinchick*, 398 F.3d at 354.  The Fifth Circuit held that this combination of evidence rebutted the defendant's arguments that the plaintiff was fired for poor performance.  *Id.*  Further, the Fifth Circuit observed that even though the progressive discipline policy was not mandatory, "these facts do not eliminate the inference of pretext raised by its failure to follow an internal company policy specifically stating that it should be 'followed in most circumstances.'"  *Id.* at 354 n.29.

The Fifth Circuit clarified its position on non-mandatory discipline policies in *Taylor*.  *Taylor v. Peerless Indus. Inc.*, 322 F. App'x 355, 367 (5th Cir. 2009) (unpublished).  The Fifth Circuit held

that when an employer goes to "great pains to emphasize that the disciplinary measures used in a particular case will be highly dependent on the specific circumstances and that managers 'may employ some, all or none' of the steps," the failure to follow a progressive discipline policy does not "provide any relevant information" regarding pretext.  *Id*.  The Fifth Circuit also opined that an additional relevant factor in a pretext analysis is whether the "[non-mandatory] policy was applied differently to similarly situated employees."

Turning to MCFA's discipline policy, the court will now consider whether Eyob has established that Chasteen's failure to use progressive discipline is substantial evidence to support an inference of pretext.

The first policy states that "MCFA believes in a process of progressive disciplinary action" and per the policy "[the employee] may receive either a verbal warning, or a written reprimand, or a suspension without pay, or some other disciplinary action." Dkt. 23, Ex. D at 5.  The same policy says "some single violations of company rules, and some accumulations of lesser violations, can result in the immediate termination of your employment . . . . [You] should not take the remainder of this section of your handbook as a guarantee that MCFA will always take progressive disciplinary action."  *Id*.  The first policy specifically says that "immediate termination" is always a possibility regardless of the terms of the policy.  *Id.*

Eyob directs the court to the portions of the first policy that include a list of violations that are "likely" the cause for immediate termination. Dkt. 23 at 8–9 (citing Ex. D at 5).  Quality issues and poor performance do not appear on that list. Dkt. 23, Ex. D at 5.  Further, "unsatisfactory job performance" is listed in a different discipline category where "excessive accumulation" could result in termination. Dkt. 23, Ex. D at 6.  However, the introduction text to the lists of rule violations specifically states that the lists are "not intended to be all-inclusive."  *Id*. at 5.

12

The second policy, which appears to provide instructions to managers, states that the "best way" to handle problem employees is with progressive discipline. Dkt. 23, Ex. A at 2. However, this policy states "[w]hen an employee's performance is unsatisfactory . . . appropriate disciplinary action may be taken, up to and including termination of employment, without prior warning or notice. . . ." *Id*. Further the policy states "[t]he implementation of [the Progressive Discipline policy] should not be construed as preventing, limiting, or delaying MCFA from taking appropriate disciplinary action . . . including termination without prior warning, where MCFA, in its sole discretion, deems appropriate . . . *Id*.

Here, the circumstances of Eyob's employment are distinguishable from the circumstances in *Manchinchick*. *Machinchick,* 398 F.3d at 354. In *Manchinchick,* the Fifth Circuit treated the lack of warnings under the progressive discipline policy as one piece of a collection of other evidence which all point to the plaintiff employee's satisfactory performance and serves to rebut the employer's claims of poor performance. *Id*. Unlike in *Manchinchick,* Eyob received poor performance appraisals in the quality area and had at least some other conversations with his supervisor about quality issues that indicate poor performance. Therefore, the court concludes that the lack of discipline under the progressive discipline policy in this case does not give rise to the presumption that Eyob's performance was satisfactory like the employee plaintiff in *Manchinchick.*

Also, there is no evidence that MCFA diverged from its discipline policies.[3] The first and second policy repeatedly include language explaining that MCFA may bypass any portion of the

---

[3] Eyob points out that the second policy requires a manager to produce a written report either before disciplinary action is taken or within one day after it was taken. Dkt. 23, Ex. E at 4. Here, Eyob alleges no report was prepared, in violation of the policy. Dkt. 23 at 26–27. However, because the report can be prepared after the termination, the court finds that the lack of a report is not a probative factor in determining whether Eyob was treated in a non-discriminatory manner by company policies prior to his termination.

progressive discipline policy and terminate the employee for a single infraction or an accumulation of incidents that were not subject to progressive discipline. *Taylor*, 322 F. App'x at 367. Chasteen admits that he did not follow this policy and testified that he was not even aware of its existence. Dkt. 23-13 (Chasteen Dep.) at 44; Dkt. 24, Ex. A (Pierce Dep.) at 55 (confirming progressive discipline not mandatory). Eyob offers no evidence and makes no arguments that MCFA's progressive discipline policy was exercised for the other plant supervisors, but bypassed only in his case. Dkt. 21 at 29.

Here, the court finds that the language in the progressive disciplinary policy is more aligned with the *Taylor* holding, because the policy language goes out of its way to identify circumstances in which progressive discipline may be bypassed. *Taylor*, 322 F. App'x at 367. Further, unlike in *Manchinchick,* Eyob does not offer sufficient additional evidence of his good performance to rebut MCFA's evidence of poor performance. Dkt. 23. Therefore, the court finds that Eyob's arguments that Chasteen failed to follow the progressive discipline policy do not meet his burden to show by substantial evidence that MCFA's reasons for terminating Eyob were pretextual**.**

### c. Disparate Treatment of Similarly Situated Employees

Eyob also argues that the other similarly-situated plant supervisors, specifically Uy (who is an Asian male) and Hilgert (who is a white male), were not fired even though they also had quality issues on their lines. Dkt. 23 at 23. When employees are similarly-situated, but treated differently, that can give rise to the presumption of pretext. *Hernandez v. Yellow Transp., Inc*., 670 F.3d 644, 659 (5th Cir. 2012). The Fifth Circuit defines "similarly situated" very narrowly. *See Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259–60 (5th Cir. 2009).[4] "[A]n employee who proffers a fellow

---

[4] In *Lee*, the Fifth Circuit discussed "nearly identical" standard for "similarly situated" employees in the *prima facie* phase of the burden shifting analysis. *Lee*, 574 F.3d at 259. However, other Fifth Circuit and district court holdings utilize the same standard in the pretext portion of the

employee as a comparator [must] demonstrate that the employment actions at issue were taken 'under nearly identical circumstances.'" *Id*. at 260 (quoting *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)); *see also Perez v. Tex. Dep't of Criminal Justice, Inst'l Div.*, 395 F.3d 206, 213 (5th Cir. 2004) ("We . . . have explained consistently that for employees to be similarly situated those employees' circumstances, including their misconduct, must have been 'nearly identical.'").  The "nearly identical" standard is a stringent standard—employees with different responsibilities, different supervisors, different capabilities, different work rule violations, or different disciplinary records are not considered to be "nearly identical." *Player v. Kan. City S. Ry. Co.*, 496 Fed. App'x 479, 481 (5th Cir. 2012) (quoting *Lee*, 574 F.3d at 259–60).

Eyob argues that Uy and Hilgert are similarly situated employees, because they supervise production lines with Chasteen as a manager.  Dkt. 23 at 10–13, 23.  MCFA admits that all three Plant Supervisors had the same responsibilities as supervisors, but contends that they had different duties on their lines.  Dkt. 21, A-10; Dkt. 23-13 (Chasteen Dep.) at 48–49.  MCFA argues that Hilgert and Uy managed different lines with different responsibilities, and even though they experienced quality issues, the issues were neither as severe or frequent as Eyob's.  Dkt. 21 at 28–29.

With respect to Uy, Eyob argues that Uy's Final Finish Line had more quality problems and defects, yet Uy was never terminated and scored higher on his performance appraisals.  Dkt. 23 at 7 (citing Dkt. 23-13 (Chasteen Dep.) at 40 and Dkt. 23, Ex. C).  Further, Eyob argues that Uy received

---

burden shifting analysis to evaluate disparate treatment of similarly situated employees. *See, e.g.*, *Okoye*, 245 F.3d at 513; *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001); *Jones v. FJC Sec. Servs., Inc.*, 40 F. Supp. 3d 840, 852 (S.D. Tex. 2014), *aff'd*, 612 F. App'x 201 (5th Cir. 2015) ("[O]ne way [to show pretext] is to show that the employer treated plaintiff more harshly that other similar situated employees for nearly identical conduct.") (internal quotations omitted); *Hockman v. Westward Commc'ns, L.L.C.*, 282 F. Supp. 2d 512, 527 (E.D. Tex. 2003) ("The 'nearly identical' standard, when applied at the *McDonnell Douglas* pretext stage is a stringent standard.").

more negative comments on his performance appraisal for Customer Focus, was never terminated, and received a larger raise.  Dkt. 23, Exs. J, K.

MCFA explains that the Final Finish line that Uy supervised was not responsible for the mechanical assembly of the forklifts, but rather for finish details.  Dkt. 23-13 (Chasteen Dep.) at 48; Dkt. 24, Ex. B (Krakora Dep.) at 2–3.  Therefore, quality defects from Uy's line are not as serious as those from a mechanical assembly line such as Eyob's line.  *Id*.  The court agrees with MCFA. There is a difference in work responsibilities and quality expectations from a final finish line and a mechanical assembly line, meaning that Uy and Eyob do not meet the very narrow standard for "nearly identical."  *Player*, 496 F. App'x at 479.

With respect to Hilgert, Eyob argues that Hilgert's line also had an hydraulic lever issue but that Hilgert was not terminated.  Dkt. 23 (citing Dkt. 23-13 (Chasteen Dep.) at 48).  MCFA explains that Hilgert's employees were new and the quality issues occurred while they were still in their training period.  Dkt. 23-13 (Chasteen Dep.) at 48.  Further MCFA provides a copy of Hilgert's performance appraisal documenting that, unlike Eyob, Hilgert made improvements in quality and had higher overall performance scores than Eyob.  Dkt. 21, Ex. A-9.  The court agrees with MCFA. Hilgert's line experienced different work conditions than Eyob's and Hilgert's performance history was different than Eyob's, meaning that Hilgert and Eyob do not meet the very narrow standard for "nearly identical."  Therefore, the court concludes that Eyob did not offer substantial evidence of pretext by demonstrating similarly situated plant supervisors were treated differently.

### d.  Racial Animus

Finally, Eyob argues that Chasteen exhibited racial animus, giving rise to a presumption of pretext.  Dkt. 23 at 22 (citing *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456, 126 S. Ct. 1195 (2006)). "Evidence of animus towards a protected group may indicate pretext."  *Spears v. Patterson UTI*

*Drilling Co.*, 337 F. App'x 416, 420 (5th Cir. 2009). However, "stray remarks" and "comments that are vague and remote in time are insufficient to establish discrimination." *Id.* (quoting *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir.1996)) (internal quotes omitted). Taking a "cautious view" of the stray remarks doctrine, the Fifth Circuit does not require that the discriminatory remark or remarks to be made in the "direct context of the termination." *Cervantez v. KMGP Servs. Co. Inc.*, 349 F. App'x 4, 11 (5th Cir. 2009). When a discriminatory remark is used as circumstantial evidence of pretext, it is probative of discriminatory intent, but it cannot be used as the sole proof of pretext. *Id.*; *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 577 (5th Cir. 2003).

Eyob alleges the following instances of racially charged actions and comments as evidence of racial animus: Chasteen's comments regarding Barack Obama, Chasteen and Yu watching of a video of a rural African village, Chasteen's referral to black employees as "Mr. Wayne," Chasteen's use of a gesture offensive in Ethiopian culture, and Chasteen's potential use of a derogatory racial slur.[5] Dkt. 23 at 21–22. Eyob testified that no derogatory language or racial comments were directed at him, except for the comments regarding Barack Obama. Dkt. 21, Ex. B at 5, 10 , 13, 14, 22, 24, 28, 30. Though Chasteen denies making some of these comments, the court will view this evidence in the light most favorable to the non-movant, Eyob. *Envtl. Conservation Org.*, 529 F.3d at 524. The court will consider each of these actions and comments in turn.

The first and second allegations of racial animus involve Chasteen's comments about Barack Obama, which occurred in the lead up to the 2012 election, and Chasteen and Yu's watching the rural African village video sometime in 2013. Dkt. 21, Ex. B (Eyob Dep.) at 12, 22–23. Eyob was

---

[5] Eyob's response also offers evidence that Benyam Haile, a former MCFA employee, witnessed Chasteen using racist language during his employment from 1999-2001. Dkt. 23-13 at 70. MCFA objects to the court considering this evidence as inadmissible hearsay. Dkt. 24 at 2. The court finds that any evidence offered by Haile, even if it is admissible, is too remote in time to establish racial animus for the purposes of Eyob's termination.

terminated in April 2014.  The court finds that these isolated incidents are too remote in time with respect to Eyob's termination to establish pretext.  *See, e.g.*,  *Manaway v. Med. Ctr. of Se. Tex.*, 430 F. App'x 317, 323 (5th Cir. 2011) (holding that a supervisor's threat to send the Ku Klux Klan to an African-American colleague's house, which was made one year prior to the termination and not directed at the plaintiff, was too remote in time to give rise to an inference of pretext); *Lister v. Nat'l Oilwell Varco, L.P.*, No. CIV.A. H-11-01, 2013 WL 5515196, at *19 (S.D. Tex. Sept. 30,  2013) (Rosenthal, J.) (holding that racist comments made at least a year prior to the plaintiffs' terminations, "while tone deaf and offensive," are "too attenuated and too remote in time from the decisions to fire either plaintiff to support an inference of discrimination.").

The third allegation of racial animus is that Chasteen would refer to African American employees as "Mr. Wayne," apparently in reference to a former employee of MCFA.  Dkt. 21, Ex. B (Eyob Dep.) at 25–26.  Eyob argues that he heard Chasteen use this term "about four or five times," that it was never directed at him, and that he could not recall when he witnessed it.  *Id.* at 24.  The court accepts, *arguendo*, that this comment is discriminatory.  *Medina v. Ramsey Steel Co.*, *Inc.*, 238 F.3d 674, 683 (5th Cir. 2001) ("[W]here a remark is capable of both a discriminatory and a benign inference, in the summary judgment context the inference must be drawn in favor of the nonmovant.").   However, the effect of Chasteen's use of "Mr. Wayne" is attenuated because Chasteen never refereed to Eyob as Mr. Wayne and Eyob does not provide evidence that Chasteen used the term "Mr. Wayne" in temporal proximity to his termination .  *See, e.g., Hunter v. Union Pac. R. Co.*, No. CIV.A. H-11-3408, 2013 WL 4511359, at *3 (S.D. Tex. Aug. 23, 2013) (holding the supervisors' use of a derogatory racial slur in the workplace, while highly offensive, is not sufficient to establish pretext); *Leach v. Baylor Coll. of Med.*, No. CIV.A. H-07-0921, 2009 WL 385450, at *26 (S.D. Tex. Feb. 17, 2009) (holding that the use of the term "black boys" alone is not

enough to establish pretext). Therefore, the court finds that Chasteen's alleged use of the term "Mr. Wayne" is insufficient evidence to establish pretext.

The fourth allegation of racial animus is that Chasteen would waive his finger to summon Eyob in a manner that is rude in Ethiopian culture. Dkt. 21, Ex. B (Eyob Dep.) at 25–26. Eyob states that he explained to Chasteen that the gesture is considered "offensive," "rude," and it means that the person it is used with is "lowly and comparable to garbage." *Id*. Chasteen denies that he understood the meaning of the gesture. Dkt. 21, Ex. C (Chasteen Dep.) at 23. Title VII is not intended to protect against "petty slights, minor annoyances, and simple lack of good manners." *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S. Ct. 2405 (2006)). Assuming Eyob's version of events is true, the court agrees that Chasteen's use of the finger-waiving gesture was purposely rude to Eyob. But, Eyob explained to Chasteen that the gesture was "offensive" and "rude" in his culture, but he never claimed that the gesture was racially discriminatory.[6] Dkt. 21, Ex. B (Eyob Dep.) at 25–26. As such, Eyob cannot rely on Chasteen's use of this gesture as evidence of his discriminatory intent.

The fifth allegation of racial animus is that Chasteen could not deny that he had ever used a derogatory racial slur (the n-word). Dkt. 23-13 (Chasteen Dep.) at 56. Eyob does not offer any evidence of Chasteen using that slur, let alone evidence that he directed that slur toward Eyob or used it in temporal proximity to the termination decision. Dkt. 21, Ex. B (Eyob Dep.); Dkt. 23 at 20 (arguing "if someone cannot answer emphatically and unequivocally that he does not use the n-word, it is an extraordinarily strong indication that he does."). Nor did Eyob testify that he

---

[6] The court observes that Eyob's causes of action only accuse MCFA of discrimination based on race, not national origin. Dkt. 1 at 5.

19

witnessed Chasteen using the n-word. Dkt. 21, Ex. B (Eyob Dep.); Dkt. 23-13 at 2–20 (Eyob Dep.). The court finds that this accusation is too vague to establish pretext.

Finally, the court must consider all of Chasteen's comments collectively. Assuming these accusations are true, Chasteen's behavior is troubling and offensive. However, the collection of allegations of racial animus are not in temporal proximity to Eyob's termination and are vague. Finally, the court has already concluded that Eyob's other evidence of pretext is insufficient. In the circumstantial evidence context, stray comments exhibiting racial animus, in the absence of other evidence, is not sufficient to establish pretext. *Palasota.*, 342 F.3d at 577. Because of these reasons, Eyob did not meet his burden of offering substantial evidence in support of pretext. Therefore, MCFA's motion for summary judgment on Eyob's employment discrimination claim is GRANTED.

## B.   Hostile Work Environment

Eyob alleges that he was subjected to a hostile work environment on the basis of his race. Dkt. 1 at 5 .  To make a *prima facie* showing of hostile work environment, Eyob must show:  (1) he belongs to a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his membership in the protected class; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take adequate remedial action. *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005).  The work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S. Ct. 2275 (1998) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367 (1993)).

MCFA argues that Eyob has not made a *prima facie* showing of a hostile work environment claim because (1) Eyob can not identify any harassment based on race, and (2) Eyob failed to show

that the alleged harassment affected a term, condition, or privilege of his employment.  Dkt. 21 at

15–23.  Eyob does not directly address this argument in his response.  Dkt. 23.

First, MCFA argues that Eyob has not established that the harassment he was subjected to

was directed to his status as a member of a protected class.  Dkt. 21 at 15–16.  Eyob testified that he

was subjected to comments regarding Barack Obama, that he witnessed black employees called "Mr.

Wayne," that he watched Chasteen and Uy make fun of a video of a rural African village, and that

he was subjected to Chasteen's finger-waiving gesture after he explained it was offensive in his

culture.  Dkt. 21, Ex. B (Eyob Dep.).  It would be possible for a reasonable jury to find that these

incidents are racially-charged.  Therefore, the court finds that Eyob has sufficiently established an

issue material fact that the alleged incidents of harassment were directed to his status as a member

of a protected class.

Second, MCFA argues that Eyob has not established that a term, condition, or privilege of

employment was affected by the alleged harassment.  Dkt. 21 at 23  For harassment to affect a term,

condition, or privilege of employment, it must be "sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment."  *Hernandez*,

670 F.3d at 651 (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir.2002)).  In determining

whether an abusive work environment exists, a court must assess the totality of the circumstances,

including:  (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct

is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct

unreasonably interferes with an employee's work performance.  *Harris*, 510 U.S. at 23; *Alaniz v.

Zamora–Quezada*, 591 F.3d 761, 771 (5th Cir. 2009).  In considering the factors, "[n]o single factor

is determinative."  *EEOC v. WC & M Enters., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007).  Simple

teasing, rude or offensive comments, or isolated incidents will not amount to actionable

discrimination.  *Harris*, 510 U.S. at 21; *Hockman v. Westward Commc'ns, L.L.C.*, 407 F.3d 317, 326 (5th Cir. 2004).  Conclusory allegations of a hostile work environment will not suffice.  *Bryan v. Chertoff*, 217 F. App'x 289, 294 (5th Cir. 2007).

First, Eyob does not make any allegations that Chasteen used physical force or threatened him.  Dkt. 21, Ex. B (Eyob Dep.) at 30.  Second, with regard to the frequency and severity of conduct, the court finds that the Eyob's specific allegations of harassment, the "Mr. Wayne" references, the rural African village video, and the Barack Obama conversation were infrequent and isolated instances and they are not sufficient to establish severe or pervasive harassment.  *See e.g.*, *Johnson v. TCB Constr. Co, Inc.*, 334 F. App'x 666, 671 (5th Cir.2009) (per curiam) (unpublished) (holding that the isolated use of a derogatory racial slur against the plaintiff and no evidence regarding its effect on work performance is insufficient to establish a hostile work environment claim); *Turner v. Baylor Richardson Medical Ctr.*, 476 F.3d 337, 348 (5th Cir.2007) (holding that a supervisor's repeated references to "ghetto children" was not sufficient to establish the existence of a hostile work environment).  Additionally, neither the "Mr. Wayne" reference nor the video werer directed toward Eyob.  "Second-hand harassment, although relevant, [is] less objectionable than harassment directed at the plaintiff."  *Johnson v. TCB Const. Co.*, 334 F. App'x 666, 670–71 (5th Cir. 2009) (citing *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005)).  Because these comments were not directed toward Eyob, the court finds their second-hand nature makes them less severe.

Unlike the other alleged incidents, Eyob alleges that Chasteen used the finger-waiving gesture more frequently and pervasively.  Dkt. 21, Ex. B (Eyob Dep.) at 25.  Eyob accuses Chasteen of wanting to "humiliate" him with this gesture; however, Eyob testifies that the gesture is "offensive" and "rude," not humiliating.  *Id*.  A rude or offensive gesture is insufficient to establish

a hostile work environment.  *Harris*, 510 U.S. at 21; *Hockman*, 407 F.3d at 326.  Therefore, these court finds that the frequency and severity factors weigh against a finding that the totality of circumstances created a hostile and abusive work environment.

In terms of interfering with Eyob's work performance, the only probative allegations regarding Eyob's work environment being affected by racial hostility are that  Eyob was not allowed to lead a facility tour during the 2014 Houston Livestock Show and Rodeo and that he had to "deal with it" when he was short staffed. Dkt. 21, Ex. B (Eyob Dep.) at 12, 26–27, 32.  Further, Eyob does not establish that being told to "deal with it" was at all caused by or related to racial harassment.  The court agrees with MCFA—Eyob failed to offer evidence that his work performance was unreasonably altered by racial hostility.  Dkt. 21 at 23.  Therefore, this factor weighs against finding a hostile and abusive work environment.

Based on the totality of circumstances, the court finds that Eyob failed to demonstrate that the terms, conditions, or privileges of Eyob's employment was affected by the alleged harassment.  Therefore, the court concludes that Eyob has not met his burden to establish a *prima facie* case for a hostile work environment.   MCFA's motion for summary judgment on the hostile work environment claim is GRANTED.

## C.    Eyob's Motion for Partial Summary Judgment

Finally, Eyob filed a motion for partial summary judgment on MCFA's mixed motive and failure to mitigate damages defenses.  Dkt. 22.  The court has concluded that MCFA's motion for summary judgment should be granted with respect to all of Eyob's claims.  Therefore, the court need not consider Eyob's motion for partial summary judgment.  *Id*.  Eyob's motion for partial summary judgment is DENIED AS MOOT.  *Id*.

23

**IV. Conclusion**

MCFA's motion for summary judgment is GRANTED.  Dkt. 21.  Eyob's claims against

MCFA are DISMISSED WITH PREJUDICE.

Eyob's motion for partial summary judgment is DENIED AS MOOT.  Dkt. 22.

Signed at Houston, Texas on July 28, 2017.

_____
Gray H. Miller
United States District Judge